

FILED

SEP  8 2004

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFOR:
BY_____
          DEPUTY CLERK

1

2

3

4

5

6

7              IN THE UNITED STATES DISTRICT COURT

8          FOR THE EASTERN DISTRICT OF CALIFORNIA

9

10  MICHAEL L. POTTS, D.D.S., and
    THE AMERICAN ACADEMY OF IMPLANT
11  DENTISTRY,                                    CIV-S-03-0348 DFL/DAD

12        Plaintiffs,

13        v.                                      MEMORANDUM OF OPINION AND
                                                          ORDER
14
    KATHLEEN HAMILTON, Director,
15  California Department of
    Consumer Affairs; CYNTHIA
16  GATLIN, Executive Officer,
    California Dental Board; and
17  ALAN H. KAYE, D.D.S., President;
    MICHAEL PINKERTON, Vice-
18  President, Public Member; LA
    DONNA DRURY-KLEIN, R.D.A.,
19  Secretary; DAVID I. BARON,
    Public Member; NEWTON GORDON,
20  D.D.S., Member; LAWRENCE
    HYNDLEY, D.D.S., Member;
21  PATRICIA OSUNA, R.D.H., Member;
    GEORGE SOOHOO, D.D.S., Member;
22  ARIANE TERLET, D.D.S., Member;
    and CHESTER YOKOHAMA, D.D.S.,
23  Member, in their official
    capacities with the California
24  Dental Board,

25        Defendants.

26  _____

1    This case is a further chapter in the long-running dispute

2  between plaintiffs and the State of California over the State's

3  prohibitions upon the advertising of dental specialty

4  credentials.   Plaintiffs challenge a recently enacted California

5  statute restricting the advertising of dental specialty

6  credentials to those credentials recognized by the American

7  Dental Association ("ADA") or the Dental Board of California

8  ("Dental Board").   The court previously found that an earlier

9  version of this statute violated the protection afforded to

10  commercial speech by the First Amendment.   See Bingham v.

11  Hamilton, 100 F.Supp.2d 1233 (E.D.Cal. 2000).   This renewed

12  effort to limit the advertising of bona fide credentials fares no

13  better.   The advertising of credentials in dental specialties

14  awarded by boards not recognized by the ADA or the Dental Board

15  is not inherently or actually misleading.   In addition, even if

16  such advertising were potentially misleading, the statute is more

17  restrictive than necessary to advance the State's interest in

18  preventing false or misleading advertising of dental specialty

19  credentials.   Therefore, the statute violates the First

20  Amendment, and plaintiffs are entitled to summary judgment.

21                                    I.

22  A.   The Parties

23    Plaintiffs are Dr. Michael L. Potts, D.D.S. ("Potts") and

24  the American Academy of Implant Dentistry ("AAID").   Potts is a

25  California-licensed dentist in Camarillo and has been practicing

26  general dentistry since 1975.   He holds the credentials of

"Fellow" from AAID and "Diplomate" from AAID's certifying board, the American Board of Oral Implantology/Implant Dentistry ("ABOI/ID"), and he wants to advertise these credentials by listing them after his name. (Pls.' Mot. at 9.)

AAID is a national dental specialty organization which claims approximately 60 credentialed member dentists in California. (Id. at 2.)  AAID sues in its own name and on behalf of its credentialed members in California. (Id.)  AAID seeks to advance knowledge, skill, and expertise in the field of implant dentistry.  To that end, AAID and ABOI/ID award various credentials to their members who fulfill certain educational, practice, and testing requirements.  AAID awards the credentials of "Associate Fellow" and "Fellow," while ABOI/ID awards the higher credential of "Diplomate" (which is often advertised as "Board Certified"). (Id. at 1-2.)  Besides completion of a dental degree, each of these credentials requires a certain number of years of practice in implant dentistry, completion of a substantial number of hours of continuing education in implant dentistry, completion of a multiple-choice written examination, and presentation of a certain number of cases exhibiting competence in performing various types of implants.  (Exs. in Supp. of Pls.' Mot., Ex. B.)  None of these credentials requires completion of a graduate or postgraduate education program in implant dentistry at a university-based dental school. (Pls.' Mot. at 9.)

Defendants are the Director of the California Department of

Consumer Affairs and the Executive Officer, President, Vice-President, Secretary, and other members of the Dental Board of California.  Defendants are charged with enforcing the statute at issue in this case and are sued solely in their official capacities.  Plaintiffs seek a declaration that the statute is unconstitutional and an injunction against its enforcement.

B.  Background and Prior Litigation

Any dentist with a general license to practice may perform implant dentistry in California.[1]  There is no requirement of special training or education in implant dentistry.  In addition, a general dentist may advertise that he limits his practice to implant dentistry.  (Id. at 4-5.)  While implant dentistry is an area of dental specialization in the broad sense, it is not a specialty recognized by the ADA or the Dental Board.[2]  The current dispute centers around California's refusal to permit dentists to advertise their credentials earned from specialty

---

[1]  "Implant dentistry consists of the placing of devices for attaching artificial replacement teeth to the same bones to which natural teeth are anchored. . . .  According to the AAID, unlike most current forms of dentures, which sit on top of the gums or are attached to existing teeth, implants may be inserted into the bone, functioning like an artificial tooth root, or may be placed directly against the bone to support a dental prosthesis."  Bingham v. Hamilton, 100 F.Supp.2d at 1234 & n.1 (citations and internal quotation marks omitted).

[2]  The ADA recognizes only nine areas of dental specialization and accredits boards to award credentials in each of these areas.  These nine areas are: oral and maxillofacial surgery; prosthodontics; periodontology; oral and maxillofacial radiology; oral pathology; public health dentistry; endodontics; orthodontics and dentofacial orthopedics; and pediatric dentistry.  (Pls.' Mot. at 3.)

boards (such as AAID and ABOI/ID) that are not recognized by the ADA or the Dental Board.

In Bingham v. Hamilton, 100 F.Supp.2d 1233 (E.D.Cal. 2000) ("Bingham II"), the court held unconstitutional the enforcement policy of the Dental Board and a proposed regulation embodying that policy. At that time, the Dental Board's policy permitted a dentist to advertise a credential awarded by a specialty board only if that board was recognized by the ADA or by the Dental Board. The policy set out three criteria on which a non-ADA-recognized specialty board must condition the granting of credentials in order to be recognized by the Dental Board: (1) "successful completion of a formal advanced education program at or affiliated with an accredited dental or medical school equivalent to at least one academic year beyond the predoctoral curriculum;" (2) "successful completion of an oral and written examination based on psychometric principles;" and (3) "training and experience subsequent to successful completion of [the education and testing requirements], to assure competent practice in the dental discipline as determined by the . . . board . . . which grants the credentials." Id. at 1236-1237. Dentists holding AAID credentials could not advertise these credentials because AAID did not then - and does not now - require successful completion of a formal advanced education program at an accredited dental school equivalent to at least one academic year beyond the D.D.S. degree.

The plaintiffs in Bingham II challenged the one year of

1   postgraduate education requirement under the First Amendment.

2   The court held that the advertising of AAID credentials was not

3   inherently or actually misleading because AAID was a bona fide

4   organization that issued credentials according to objectively

5   verifiable standards.  Id. at 1240.  Further, while the State has

6   a substantial interest in preventing the general public from

7   being misled that AAID and ABOI/ID credentials are from a board

8   recognized by the ADA or the Dental Board or that such

9   credentials require successful completion of a postgraduate

10  education program at an accredited dental school, this interest

11  could be protected by a required disclaimer without a wholesale

12  prohibition on the listing of the credential.  Id. at 1240-1241.

13  C.  Business and Professions Code Section 651(h)(5)(A)

14      Some two years after the Dental Board's regulation and

15  enforcement policy was invalidated in Bingham II, the California

16  legislature enacted § 651(h)(5)(A) of the Business and

17  Professions Code.  (Id. at 5-7.)  The legislative history of this

18  provision shows that its sponsors intended to codify

19  substantially the same advertising restrictions as those embodied

20  by the proposed regulation and enforcement policy struck down in

21  Bingham II.  (Id.; see also Compl., Exs. D-J.)  Section

22  651(h)(5)(A)(i) specifically addresses dental specialty

23  advertising in specialties recognized by the ADA.  For these ADA-

24  recognized specialties, § 651(h)(5)(A)(i) forbids a dentist from

25  holding himself out as a specialist or as being a member of or

26  holding credentials from a certifying board unless that board is

1  recognized by the ADA (or the dentist has completed a specialty

2  education program approved by the ADA).  (Defs.' Mot. at 6.)  It

3  is undisputed that the AAID and ABOI/ID do not fall into this

4  category because implant dentistry is not an ADA-recognized

5  specialty.  (Id.; Pls.' Mot. at 8.)

6        Section 651(h)(5)(A)(ii) regulates specialty advertising by

7  dentists in areas of dentistry that are not recognized as

8  specialties by the ADA.  (Defs.' Mot. at 6.)  It allows a dentist

9  specializing in one of these areas to advertise credentials

10 awarded by a non-ADA-recognized specialty board (such as AAID and

11 ABOI/ID) only if that board is recognized as a bona fide

12 organization by the Dental Board.  In order to be recognized as

13 bona fide, a non-ADA-recognized specialty board must condition

14 credentialing or membership on three requirements that are

15 similar to the three requirements for non-ADA-recognized

16 specialty boards contained in the regulation at issue in Bingham

17 II.  These three requirements are: (1) "successful completion of

18 a formal, full-time advanced education program that is affiliated

19 with or sponsored by a university based dental school and is

20 beyond the dental degree at a graduate or postgraduate level;"

21 (2) "prior didactic training and clinical experience in the

22 specific area of dentistry that is greater than that of other

23 dentists;" and (3) "successful completion of oral and written

24 examinations based on psychometric principles."  Cal. Bus. &

25 Prof. Code § 651(h)(5)(A)(ii)(I)-(III).  It is undisputed that

26 AAID and ABOI/ID do not condition membership or credentialing on

1  successful completion of a formal, full-time advanced education

2  program at a university-based dental school that is beyond the

3  dental degree.  (Defs.' Mot. at 6-7; Pls.' Mot. at 9.)  As in

4  <u>Bingham II</u>, plaintiffs challenge this educational requirement as

5  unconstitutional because it completely prevents advertising of

6  AAID and ABOI/ID credentials.

7      Defendants point out that even if a dentist is not allowed

8  to advertise a specialty credential under § 651(h)(5)(A)(i) or

9  (ii), he may still advertise a practice emphasis in any area of

10  dentistry, as long as he indicates in the advertisement (in

11  capital letters) that he is a general dentist.  Cal. Bus. & Prof.

12  Code § 651(h)(5)(A)(iii).  In the context of this case,

13  defendants have indicated that nothing in § 651(h)(5)(A)

14  prohibits implant dentists like Potts from advertising that they

15  limit their practices to implant dentistry or that they have

16  completed a certain number of continuing education classes in

17  implant dentistry.  (Defs.' Mot. at 7.)  Defendants also

18  acknowledge that nothing in § 651(h)(5)(A) prohibits AAID members

19  from advertising that they are "members" of AAID.  But Potts may

20  not advertise that he is a "Fellow" of AAID and a "Diplomate" of

21  (or "Board Certified" by) ABOI/ID.  He may not indicate to the

22  general public that he is a credentialed member of AAID and

23  ABOI/ID.  (<u>Id.</u> at 8.)  In short, while Potts can advertise that

24  he limits his practice to implant dentistry and has taken courses

25  in implant dentistry, he cannot advertise that he has achieved a

26  measure of expertise as determined by AAID and ABOI/ID.

II.

A.  Res Judicata

Plaintiffs argue that defendants are precluded from contesting the constitutionality of § 651(h)(5)(A) because substantially the same advertising restrictions were held unconstitutional in Bingham II and defendants had a full opportunity in that action to defend the restrictions.  (Pls.' Mot. at 17-19.)[3]

Defendants do not dispute that the parties in Bingham II and in this case are identical and that Bingham II was litigated to a final judgment on the merits.  (Defs.' Opp'n at 5-6.)  However, defendants contend that no identity of claims or issues exists between this case and Bingham II.  (Id. at 6-8; Defs.' Reply at 3-6.)  The court agrees.  While the claims and factual circumstances are quite similar, they are not the same.  The educational requirement in § 651(h)(5)(A)(ii)(I) insists upon "successful completion of a formal, full-time advanced education program that is affiliated with or sponsored by a university

---

[3]  Claim preclusion bars relitigation of claims that were raised or could have been raised in a prior lawsuit.  It requires an identity of claims, a final judgment on the merits in the prior lawsuit, and identity of, or privity between, the parties in the first and second lawsuits.  Owens v. Kaiser Found. Health Plan, Inc., 244 F.3d 708, 713 (9th Cir. 2001).  Issue preclusion bars relitigation of issues actually litigated and decided in a prior lawsuit.  It requires an identity of issues, a final judgment on the merits in the prior lawsuit, a full and fair opportunity to litigate the issue in the prior proceeding, actual litigation and decision of the issue in the prior proceeding, and the necessity of that issue to support a final judgment on the merits in the prior proceeding.

based dental school and is beyond the dental degree at a graduate
or postgraduate level."   By contrast, the regulatory educational
requirement in Bingham II entailed "successful completion of a
formal advanced education program at or affiliated with an
accredited dental or medical school equivalent to at least one
academic year beyond the predoctoral curriculum."   Bingham II,
100 F.Supp.2d at 1236.   Moreover, in Bingham II there was no
dispute by defendants that AAID and ABOI/ID were bona fide
organizations who issued bona fide, not sham, credentials.   Now
that the State legislature has acted to reinvigorate the
regulation, defendants contend, and the statute provides, that
any organization and credential that does not meet the statutory
requirements cannot be bona fide and must be misleading to the
public.   Finally, the court has discretion to relax application
of preclusion where the defendant is a government entity,
particularly a political sovereign.   For all of these reasons,
the court declines to find that defendants are barred by Bingham
II from defending § 651(h)(5)(A).

B.   Commercial Speech

        Dr. Potts wants to tell prospective and existing patients
that he has certain credentials by, for example, displaying a
certificate in his office or including the credentials after his
name on a business card or telephone book listing.   This is a
classic form of commercial speech and, unless misleading, would
not be subject to prohibition under well-established principles.
Where the different professions are concerned, however, the

analysis becomes somewhat more complex.  Professionals who lack
the claimed credential consider that those who would advertise it
seek an unfair competitive advantage based on the false premise
that the credential equates to a higher level of skill.
Moreover, state-approved accrediting organizations believe that
they bring expertise and knowledge of the profession and its art
to the table, and see their advertising regulations as part of
their overall regulation of the profession through the
establishment of meaningful standards.  Those organizations that
are not state-sanctioned see this kind of regulation as
protectionist of certain interests and professional groups.

A state may absolutely prohibit commercial speech that is
false, deceptive, or misleading.  Va. State Bd. Of Pharmacy v.
Va. Citizens Consumer Council, Inc., 425 U.S. 748, 771-772, 96
S.Ct. 1817, 1830-1831 (1976).  Where the speech is not deceptive,
the state may restrict it "only if the [s]tate shows that the
restriction directly and materially advances a substantial state
interest in a manner no more extensive than necessary to serve
that interest."  Ibanez v. Fla. Dep't of Bus. & Prof'l
Regulation, Bd. Of Accountancy, 512 U.S. 136, 142, 114 S.Ct.
2084, 2088 (1994) (citing Central Hudson Gas & Elec. Corp. v.
Pub. Serv. Comm'n, 447 U.S. 557, 566, 100 S.Ct. 2343, 2351
(1980)).

Thus, if an advertisement is inherently misleading or has in
actual practice misled members of the consuming public, it is not
protected by the First Amendment and may be absolutely

1  prohibited.  The state need not demonstrate that a statute

2  banning such inherently or actually misleading speech directly

3  and materially advances a substantial interest or exhibits the

4  reasonable means-end fit required under the Central Hudson test.

5  However, if an advertisement is merely potentially misleading, in

6  that the information could be presented in a different way that

7  would not potentially mislead, then it is protected by the First

8  Amendment and may not be absolutely prohibited.  As to

9  potentially misleading advertisements, the state may insist upon

10  a presentation - typically the inclusion of additional clarifying

11  information such as a disclaimer - that removes the potential for

12  deception, so long as the regulation is no more extensive than

13  necessary to directly and materially advance the state's

14  interest.  See In re R.M.J., 455 U.S. 191, 203, 102 S.Ct. 929,

15  937-938 (1982); Am. Acad. of Pain Mgmt. v. Joseph, 353 F.3d 1099,

16  1106-1107 (9th Cir. 2004).

17     As to the advertising of professional credentials, the

18  Supreme Court has stated that credentials issued by bona fide

19  credentialing organizations, whose standards are rigorous,

20  objectively clear, and verifiable, cannot be inherently or

21  actually misleading because they are statements of objective,

22  verifiable fact, rather than statements of opinion or about

23  quality.[4]  Peel v. Attorney Registration & Disciplinary Comm'n,

24

_____

25     [4]  By contrast, the Court noted that advertising of
   credentials "issued by an organization that had made no inquiry
26  into [an applicant's] fitness, or by one that issued certificates
   indiscriminately for a price," could be inherently or actually
   misleading.  Peel, 496 U.S. at 102, 110 S.Ct. at 2288.  This is

496 U.S. 91, 101-102, 110 S.Ct. 2281, 2288 (1990).  However,

advertising of such credentials could still potentially be

misleading, requiring application of the Central Hudson test to

any regulation of such advertising.  Moreover, mere speculation

about the possibility of deception in hypothetical cases does not

suffice to show that an advertisement is inherently or even

potentially misleading.  The state must provide evidence to show

that there is a real potential that a particular advertisement or

credential will mislead the public in some way.  Ibanez, 512 U.S.

at 145, 146-147, 114 S.Ct. at 2090-2091.  The Court has also

cautioned that the determination of whether an advertisement or

credential is inherently or potentially misleading is necessarily

fact-intensive and case-specific.  Id. at 146, 114 S.Ct. at 2090.

C.  AAID and ABOI/ID Credentials: Inherently Misleading?

       Defendants do not contend that any member of the public has

actually been misled by AAID or ABOI/ID credentials.  Rather,

defendants primarily claim that the credentials are inherently

misleading, justifying a total ban.  Defendants rely heavily on

the Ninth Circuit's recent opinion in American Academy of Pain

Management v. Joseph, 353 F.3d 1099 (9th Cir. 2004) ("Pain

Management").  In Pain Management, the Ninth Circuit upheld

Business and Professions Code § 651(h)(5)(B), an analogous

California statute regulating advertising of medical specialty

credentials, against a First Amendment challenge brought by

credentialed members of the American Academy of Pain Management

_____

not the circumstance presented here.

1  ("AAPM").  Section 651(h)(5)(B) forbids California-licensed

2  physicians from advertising that they are certified or eligible

3  for certification by a medical specialty board unless that board

4  is either recognized by the American Board of Medical Specialties

5  ("ABMS") or approved by the Medical Board of California ("Medical

6  Board") as having requirements for certification that are

7  equivalent to those of ABMS-recognized medical specialty boards.

8  See id. at 1104.  However, the California Attorney General in

9  Pain Management clarified that § 651(h)(5)(B) restricts only use

10 of the term "board certified" and its equivalents.  Therefore,

11 unlike § 651(h)(5)(A), it does not restrict advertisement of

12 credentials, such as "diplomate" or "fellow," issued by non-

13 recognized medical specialty boards.  Id. at 1104, 1111.

14     The Pain Management court held that an advertisement using

15 the term "board certified" to denote a credential from a non-

16 ABMS-recognized medical specialty board is inherently misleading.

17 Id. at 1107-1108.  It observed that the term "board certified" is

18 a term of art that has acquired and long held a precise meaning

19 within the medical profession.  Within that context, the term

20 "board certified" means only that a doctor has been certified by

21 a board that is a member of ABMS in one of the 23 areas of

22 medical specialization recognized by ABMS.  Id. at 1104-1105.

23 "Board certified" also conveys that the doctor has achieved "a

24 high level of specialized skill and proficiency."  Id. at 1105.

25 Since the California legislature defined the term "board

26 certified" in accordance with this meaning in § 651(h)(5)(B), the

1    Ninth Circuit held that an advertisement containing a statement

2    that a doctor is "board certified" by a board not recognized by

3    ABMS would be inherently misleading.  Id. at 1108.

4        Defendants argue that just like § 651(h)(5)(B) in Pain

5    Management, § 651(h)(5)(A) gives a "special and particular

6    meaning to the advertising of postgraduate accreditations awarded

7    in specific areas of dentistry." (Defs.' Mot. at 10.)  Thus,

8    according to defendants, any advertisement of credentials that

9    does not conform to that meaning is inherently misleading.

10   However, this argument does not adequately account for the

11   differences between the statute and factual circumstances in Pain

12   Management and the statute and factual circumstances in this

13   case.

14       The statute in Pain Management has a far narrower regulatory

15   scope than the statute in this case.  Section 651(h)(5)(B)

16   restricts only use of the specific term "board certified" and its

17   equivalents, such as "certified by a board," "board eligible,"

18   and "eligible for board certification." Pain Management, 353

19   F.3d at 1104-1105 & n.3, 1111.  By contrast, § 651(h)(5)(A)

20   restricts advertisement of all credentials awarded by dental

21   specialty boards, including terms like "fellow," "diplomate," and

22   the like.  The court in Pain Management addressed only whether

23   use of the specific term "board certified" was inherently

24   misleading in the context of that case – in particular, the

25   unique, long established meaning of the term "board certified";

26   it did not hold that any advertisement of professional

15

credentials not authorized by statute would be, for that reason alone, inherently misleading.  Such an expansive view of <u>Pain Management</u> would place it in conflict with Supreme Court precedents such as <u>Peel</u> and <u>Ibanez</u> and effectively would remove all First Amendment protection from this area by permitting state legislatures to declare that all deviations from legislatively sanctioned terms and standards were inherently misleading and, therefore, subject to outright prohibition.

The <u>Pain Management</u> court relied on a particular record demonstrating that the term "board certified" had acquired a fixed, technical meaning within the medical profession, and that the California legislature had simply codified that meaning in § 651(h)(5)(B).  <u>Id.</u> at 1104-1105 (quoting <u>Peel</u>, 496 U.S. at 102 n.11, 110 S.Ct. at 2288 n.11).  By contrast, defendants in this case have provided scant evidence that all dental specialty credentials, or even terms such as "diplomate" or "specialist," have similarly acquired a fixed, technical meaning within the dental profession.  (<u>See</u> Defs.' Mot. at 3; Neumann Decl. ¶¶ 5, 11; McGinley Decl. ¶ 4.)[5]  The statute in <u>Pain Management</u>

_____

[5] Defendants provide two declarations to support their position that credentials like "diplomate" have acquired a fixed, technical meaning within the dental profession.  The Neumann Declaration simply asserts that the terms "diplomate" and "board certified" have historically been used to denote someone who has completed all the requirements of an ADA-recognized specialty certifying board.  (Neumann Decl. ¶ 11.)  Such conclusory statements cannot substitute for evidence establishing such a historical meaning for all dental specialty credentials.  The McGinley Declaration states that the dental insurance industry in California understands the term "board certified" to designate someone who has completed the requirements for certification in an ADA-recognized dental specialty.  (McGinley Decl. ¶ 4.)  This

explicitly defined the term "board certified" to accord with its

historical meaning within the medical profession.  See Cal. Bus.

& Prof. Code § 651(h)(5)(B).  There is no equivalent definition

for "board certified," "diplomate," "fellow," or any other type

of credential to be found in § 651(h)(5)(A).  Nor is there

evidence of a well-established, specialized meaning accorded to

all dental specialty credentials in the same way that the term

"board certified" has become a term of art within the medical

profession.

Finally, unlike the American Academy of Pain Management,

AAID and ABOI/ID are bona fide credentialing organizations whose

standards are rigorous, objectively clear, and verifiable.[6]  In

_____

declaration addresses only use of the term "board certified" and
therefore says nothing about the meaning of other dental
specialty credentials, such as "diplomate."

    [6] Defendants argue that the requirements for these
credentials have changed since the decision in Bingham II, and
that they cannot therefore be considered objectively clear or
verifiable, as those terms were used in Peel.  (Defs.' Mot. at
11-14.)  Defendants have presented some evidence that the methods
of qualifying for the credentials have been altered and that some
of the substantive requirements have changed in minor ways.  (See
generally Shuck Dep., Fay Decl., Ex. 1; Potts Dep., Fay Decl.,
Ex. 2.)  None of this evidence indicates that the prerequisites
for AAID and ABOI/ID credentials are not objectively clear and
verifiable.  They are readily accessible on the websites of AAID
and ABOI/ID, and they are not susceptible to subjective
manipulation.  See http://www.aaid-implant.cnchost.com/
memberservices/credentials/AFExamRequirements.pdf (last visited
August 23, 2004) (Associate Fellow requirements);
http://www.aaid-implant.cnchost.com/memberservices/
credentials/FExamRequirements.pdf (last visited August 23, 2004)
(Fellow requirements); http://www.aboi.org/requirem.htm (last
visited August 23, 2004) (Diplomate requirements).  Furthermore,
even where a credentialed AAID member has attained "Fellow" or
"Diplomate" status under an older method of qualification, there
is no evidence in the record to suggest that the previous
requirements are substantively different or less rigorous than

1  addition to attainment of a dental degree, each credential issued

2  by AAID and ABOI/ID requires a certain number of years of

3  practice in implant dentistry, completion of a substantial number

4  of hours of continuing education in implant dentistry, completion

5  of a written examination, and presentation of a certain number of

6  cases demonstrating proficiency in performing various types of

7  dental implants.  (Exs. in Supp. of Pls.' Mot., Ex. B.)  By

8  contrast, anyone with two years experience working with patients

9  experiencing pain who successfully completed a two-hour, 100-

10  question multiple choice examination could become a "board

11  certified" member of AAPM.  Pain Management, 353 F.3d at 1103.

12  Moreover, there was evidence indicating that more than eighty

13  percent of AAPM's members had not taken that examination, but

14  rather had been grandfathered in.  Id.  The factual circumstances

15  of Pain Management come very close to Peel's definition of a sham

16  organization, since AAPM apparently made little inquiry into

17  applicants' fitness and conferred membership on applicants almost

18  indiscriminately.  AAID and ABOI/ID are in a very different

19  position, awarding their credentials only to applicants who have

20  fulfilled rigorous criteria that are objectively clear and

21  _____

22  the current requirements.  Defendants' position strongly implies
   that any credentialing organization whose requirements have

23  changed in any way would not be bona fide as contemplated by the
   Peel Court.  Such a proposition is altogether too broad, as it

24  would in all likelihood exclude most credentials from the
   protections of the First Amendment on the ground that they are

25  inherently misleading.  In sum, nothing defendants have presented
   detracts from the conclusion that AAID and ABOI/ID are bona fide

26  credentialing organizations whose requirements are rigorous,
   objectively clear, and verifiable.  See Peel, 496 U.S. at 101-
   102, 110 S.Ct. at 2288.

verifiable.  Since these credentials are representations of
objectively verifiable facts, rather than statements of opinion
or quality, such credentials cannot be considered inherently
misleading.  <u>Peel</u>, 496 U.S. at 101-102, 110 S.Ct. at 2288.

In light of the differences between the statute and factual
circumstances in <u>Pain Management</u> and the statute and factual
circumstances in this case, and <u>Peel</u>'s favorable treatment of
credentials like those issued by AAID and ABOI/ID, the
credentials issued by AAID and ABOI/ID cannot be considered
inherently misleading.  It follows that § 651(h)(5)(A) cannot be
sustained on the ground that it regulates only inherently
misleading speech.

D.  <u>AAID and ABOI/ID Credentials: Potentially Misleading?</u>

In <u>Ibanez</u>, the Supreme Court held that defendants seeking to
uphold the validity of a commercial speech regulation must
provide concrete evidence to show that there is at least a real
potential that a particular advertisement will mislead the public
in a particular way.  <u>Ibanez</u>, 512 U.S. at 145, 146-147, 114 S.Ct.
at 2090-2091.  Mere speculation as to the potential for deception
in hypothetical cases does not suffice.  <u>Id.</u>  In <u>Bingham II</u>, the
defendants presented only "conclusory, anecdotal, and
speculative" evidence to show that AAID and ABOI/ID credentials
carried with them a potential to mislead the public.  <u>Bingham II</u>,
100 F.Supp.2d at 1240.  The court held that by failing to produce
any empirical evidence, defendants had failed to carry their
burden under <u>Ibanez</u>.  <u>Id.</u>

1    In this case, defendants provide two surveys to show that

2    AAID and ABOI/ID credentials are potentially misleading.  One

3    survey ("the Cogan mall survey") was conducted at malls in

4    various parts of California and surveyed 200 people.  (Cogan

5    Decl., Report, pp. 10-11, 13.)  Respondents were shown one of

6    four different mock-ups of a fictitious advertisement for a

7    dentist who is a Fellow of AAID and a Diplomate of ABOI/ID (also

8    tested as Board Certified by ABOI/ID).  (Id., pp. 12-13.)  Two of

9    these mock-ups contained the AAID and ABOI/ID credentials without

10   a disclaimer, and two featured the credentials with a

11   disclaimer.[7]  (Id., p. 12.)  The Cogan mall survey purports to

12   demonstrate that most members of the public mistakenly believe

13   (1) that completion of a full-time postgraduate education program

14   beyond the D.D.S. degree is required to earn these credentials

15   and (2) that AAID and ABOI/ID are recognized by the ADA and the

16   Dental Board.  (Id., pp. 14-26.)

17   The other survey ("the Kamins phone survey") was conducted

18   by telephone and also surveyed 200 people.  (Kamins Decl., Ex. 3,

19   pp. 2-3.)  Respondents were asked questions about whether they

20   thought that AAID and ABOI/ID credentials indicate that the

21   holder is a specialist in implant dentistry, whether a specialist

22

23       [7]  One of the two mock-ups containing the credentials
     "Diplomate of [ABOI/ID]" and "Fellow of [AAID]" included a
24   disclaimer stating that "[t]he Diplomate and Fellow designations
     are awarded on the achievement of certain qualifications which
25   can be found at www.aboi.org."  (Cogan Decl., Display, Ad #1B.)
     One of the two mock-ups containing the credential "Board
26   Certified by [ABOI/ID]" included a disclaimer stating that "The
     [ABOI/ID] is not an accrediting organization that is recognized
     by the [ADA] or the [Dental Board]."  (Id., Ad #2B.)

in implant dentistry must complete "some form of full-time training within an accredited dental school affiliated with a university," and whether AAID and ABOI/ID credentials imply that implant dentistry is a dental specialty recognized by the ADA. (Id., pp. 3-5.)  The Kamins phone survey resulted in high levels of affirmative responses to each of the preceding questions. (Id.)

These two surveys are of only limited value in determining whether AAID and ABOI/ID credentials are potentially misleading. Each suffers from serious deficiencies that render its significance open to question.  The Cogan mall survey is not a probability sample, since respondents were not pre-selected in a random manner from across the general population.  Because of the selection bias in the sampling procedure, no reliable extrapolation can be made from the results of this convenience sample to the general population of California.  (See Stokes Decl., Report, p. 2.)  More significantly, both the Cogan mall survey and the Kamins phone survey asked leading and compound questions of respondents.  The leading questions tend to suggest their own answer and may well have guided respondents to a particular answer.[8]  (See id., p. 3.)  The compound questions

---

[8]  For example, the Kamins phone survey asked the following leading questions:  "Do you believe that the [ADA] recognizes implant dentistry as one of their nine sanctioned dental specialties?"  "In your opinion, is part of the requirement to be considered a 'specialist in implant dentistry', the completion of some form of full-time training within an accredited dental school?"  "Must this dental school be affiliated with a university?"  (Kamins Decl., Ex. 3, 1st questionnaire, p. 3, questions 1, 4a, & 4b.)  The Cogan mall survey asked the

1   contain two or more elements, making it impossible to determine

2   which element the respondent addressed in his or her response.

3   (See id.)  The Kamins phone survey in particular asked

4   respondents questions that were quite long and convoluted, making

5   it unlikely that most respondents remembered the beginning of the

6   question once the interviewer reached the end of the question and

7   requested a response.[9]  (See id.)

8       Even if the results of these surveys were deemed reliable,

9   many of the responses are not relevant to the question at hand.

10  Most of the questions in each survey do not measure the

11  percentage of the general public that believes that - without

12  regard to AAID or ABOI/ID credentials - implant dentistry is a

13  dental specialty recognized by the ADA or the Dental Board.[10]

_____

15  following leading questions:  "Do you think that this dentist has
    or has not completed additional dental education beyond his
16  general dental degree?"  "Do you think that the [AAID] and the
    [ABOI/ID] are accrediting organizations recognized by the [ADA]?"
17  "Do you think this dentist is a specialist in performing dental
    implants?"  (Cogan Decl., Questionnaires & Instructions.)

18      [9]  For example, the Kamins phone survey asked the following
19  question:  "If a dentist promoted himself or herself as a
    'fellow' of the American Academy of Implant Dentistry and has
20  achieved the distinction of 'diplomate' of the American Board of
    Oral Implantology through successful completion of experiential,
21  educational and testing requirements, would you consider that
    dentist to be a 'specialist' in implant dentistry?"  (Kamins
22  Decl., Ex. 3, 1st questionnaire, p. 3, question 3.)

23      [10]  One question in the Kamins phone survey did seek to
    determine what percentage of the general public thinks that
24  implant dentistry is an ADA-recognized specialty, without mention
    of AAID and ABOI/ID credentials, and therefore what effect the
25  mention of AAID and ABOI/ID credentials has on that percentage.
    (See Kamins Decl., Ex. 3, pp. 4-5.)  The results from this
26  question seem to indicate that AAID and ABOI/ID credentials have
    relatively little effect on public perceptions about whether
    implant dentistry is an ADA-recognized dental specialty.  Forty-

1   The surveys also do not assess the background understanding of

2   the general public regarding how much education a specialist in

3   implant dentistry is required to complete.  It is impossible to

4   determine what, if any, misleading effect AAID and ABOI/ID

5   credentials have, because there is no control set against which

6   this effect can be measured.

7        Finally, although the Cogan mall survey tested the effect of

8   various disclaimers on public perceptions regarding the

9   educational requirements for and sponsorship of AAID and ABOI/ID

10  credentials, these results are also of little help to defendants.

11  First, the Cogan mall survey was conducted in a manner that

12  renders its results far from reliable.  Leaving aside the fact

13  that it is not a scientific probability survey, it also tested

14  mall shoppers who had been to a dentist in the past two years.

15  (Cogan Decl., Report, p. 13.)  It did not target people who had

16  been to an implant dentist, who required the services of an

17  implant dentist, or even who knew what implant dentistry is.

18  This is the audience that could be expected to study implant

19  dentistry advertisements with care, and rely upon them in

20  choosing a dentist, whereas the average mall shopper who has

21

22  three percent of respondents said that they thought implant
    dentistry is an ADA-recognized specialty without mention of AAID
23  and ABOI/ID credentials, while 54.5% of respondents thought that
    implant dentistry is an ADA-recognized specialty once AAID and
24  ABOI/ID credentials were mentioned.  (See id.)  This is an
    increase of only 11.5%, which provides little support for the
25  proposition that AAID and ABOI/ID credentials carry with them a
    real, concrete potential to mislead the public about whether
26  implant dentistry is an ADA-recognized specialty or whether AAID
    and ABOI/ID credentials are recognized by the ADA.

merely seen a general dentist in the past two years might not be so careful.

More significantly, the disclaimers that were tested did reduce public misperceptions about the educational requirements for and sponsorship of AAID and ABOI/ID credentials. The website disclaimer reduced the number of people who thought that such credentials require completion of some education beyond a general dental degree from 68% to 52%, while the ADA non-recognition disclaimer reduced this number from 78% to 50%. (Id., p. 16.) Furthermore, the ADA non-recognition disclaimer reduced the number of people who thought that AAID and ABOI/ID credentials are recognized by the ADA and the Dental Board from 70% to 18%. (Id., p. 20.) These numbers indicate that a carefully worded disclaimer can be quite effective at reducing the general public's confusion as to the educational requirements for and sponsorship of AAID and ABOI/ID credentials.

It is doubtful that these two surveys, standing alone, satisfy the standard articulated by the Supreme Court in Ibanez. However, it is not necessary to resolve this question. Assuming that these two surveys do meet the Ibanez threshold to demonstrate that AAID and ABOI/ID credentials are potentially misleading, § 651(h)(5)(A) can survive plaintiffs' challenge only if it satisfies the remaining three elements of the Central Hudson test. It does not.

///

///

E.  Is Section 651(h)(5)(A) More Extensive than Necessary to
Directly and Materially Advance the State's Interest in
Preventing Misleading Advertising of Professional Credentials?

Even assuming that AAID and ABOI/ID credentials are
potentially misleading, the statute as applied to those
credentials cannot withstand scrutiny under the remaining factors
of the Central Hudson test because the regulation, in the form of
a prohibition, is more extensive than necessary to advance the
State's interest in preventing misleading advertising of
professional credentials.

There is no dispute that § 651(h)(5)(A) serves a substantial
state interest.  The Supreme Court and the Ninth Circuit have
long recognized that states have a substantial interest in
regulating advertising by professionals to prevent deception of
the general public.  In re R.M.J., 455 U.S. at 202, 102 S.Ct. at
937; Pain Management, 353 F.3d at 1108-1109.  Defendants contend
that California has a substantial interest in preventing the
general public from being misled that a credential awarded by a
non-ADA-recognized dental specialty board has the same
requirements as a credential awarded by an ADA-recognized dental
specialty board.  This is a substantial interest.

Furthermore, § 651(h)(5)(A) directly and materially advances
this interest.  The purpose of § 651(h)(5)(A) is to prevent
members of the public from thinking that credentials from non-
ADA-recognized dental specialty boards convey the same assurance
of competence and skill as a credential from an ADA-recognized
dental specialty board.  The real concern of the legislature in

1  enacting this statute was that "credentials" issued for a fee by

2  fly-by-night, Internet-based dental specialty "boards" would

3  confuse the public into thinking that they were equivalent to a

4  bona fide credential issued by an ADA-recognized or equivalent

5  dental specialty board.  (Pls.' Mot. at 6-7; Compl., Exs. D-J.)

6  The legislature's solution was to ban advertisement of any

7  credential that is not awarded by a dental specialty board that

8  is recognized by either the ADA or the Dental Board.  This

9  solution does directly and materially advance the State's

10 purpose.  Whether it does so in a manner more restrictive than

11 necessary is the inquiry under the last part of the <u>Central</u>

12 <u>Hudson</u> test.

13      The Supreme Court has emphasized that the final element of

14 the <u>Central Hudson</u> inquiry is not a least restrictive means

15 analysis.  <u>Bd. of Trs. v. Fox</u>, 492 U.S. 469, 479-480, 109 S.Ct.

16 3028, 3034-3035 (1989).  Rather, defendants must demonstrate "a

17 reasonable fit between the legislature's ends and the means

18 chosen to accomplish those ends.  The fit need not be perfect nor

19 the single best to achieve those ends, but one whose scope is

20 narrowly tailored to achieve the legislative objective." <u>Pain</u>

21 <u>Management</u>, 353 F.3d at 1111 (quoting <u>Fla. Bar v. Went For It,</u>

22 <u>Inc.</u>, 515 U.S. 618, 632, 115 S.Ct. 2371, 2380 (1994)).  It is

23 within the legislature's discretion to choose between narrowly

24 tailored means of regulating commercial speech, and a court will

25 not second-guess such a choice.  <u>Id.</u> (citing <u>Fox</u>, 492 U.S. at

26 479, 109 S.Ct. at 3034).

1    In Pain Management, the Ninth Circuit ruled in an

2  alternative holding that even if the statute did not regulate

3  only inherently misleading speech it would still survive First

4  Amendment scrutiny under the remainder of the Central Hudson

5  test.  The Pain Management court determined that the mechanism

6  set up by § 651(h)(5)(B) to screen use of the term "board

7  certified" in physician advertising was narrowly tailored to

8  achieve the State's interest in eliminating misleading uses of

9  the term "board certified" in physician advertising.  Id.  While

10 the court acknowledged that less restrictive alternatives

11 existed, such as freely allowing use of the term "board

12 certified" accompanied by a disclaimer, it applied the Supreme

13 Court's teaching in Fox that the Central Hudson test is not a

14 least restrictive means inquiry and recognized that the statute

15 at issue represented a reasonable fit between the legislature's

16 purpose and the means chosen to accomplish that purpose.  Id.

17     Important to the Pain Management court's analysis under this

18 part of the Central Hudson test was the salient fact that

19 § 651(h)(5)(B) restricts only use of the term "board certified"

20 and does not restrict all advertisement of credentials awarded by

21 non-recognized medical specialty boards.  Id.  The court

22 specifically noted that the defendants in that case had conceded

23 that an AAPM member could advertise that he or she is a Diplomate

24 of AAPM, but simply could not use the words "board certified" in

25 the advertisement.  Id.

26     Defendants in this case now argue that § 651(h)(5)(A) is

identical in all material respects to the statute at issue in
Pain Management, and seek to take advantage of the Pain
Management holding free of the critical concessions offered to
secure that holding.  But the two statutes are clearly different.
The statute in this case forbids dentists from advertising any
dental specialty credential not recognized by the ADA or the
Dental Board, and is therefore distinctly broader in scope than
the statute in Pain Management.  In light of this critical
distinction, one that the Ninth Circuit highlighted in the Pain
Management opinion, the outcome of the reasonable fit analysis in
this case has not been foreordained by Pain Management.

Section 651(h)(5)(A) is not narrowly tailored and is more
extensive than necessary to achieve the State's interest in
preventing misleading advertising of dental specialty
credentials.  Prohibiting the advertising of any credential that
is not recognized by the ADA or the Dental Board or awarded by a
board with equivalent requirements is substantially overbroad.  A
disclaimer requirement would restrict far less speech than an
outright prohibition on advertising these credentials.
Defendants' concern about consumer confusion as to sponsorship
could be addressed by requiring a disclaimer that AAID and
ABOI/ID are not recognized by or affiliated with the ADA or the
Dental Board.  The goal of assuring that consumers are not misled
about the educational requirements for AAID and ABOI/ID
credentials could be achieved by requiring advertisements to list
the educational requirements for those credentials or to direct

consumers to an Internet website containing that information. See Bingham II, 100 F.Supp.2d at 1240-1241.  At least in the context of the circumstances here, involving a legitimate professional organization and genuine credentials as opposed to a sham arrangement, these kinds of disclaimers should suffice to protect the State's interests.  Defendants' own surveys accord with this conclusion.

While a court may not invalidate a statute that goes "only marginally beyond what would adequately have served the governmental interest," the statute in this case is "substantially excessive, disregarding far less restrictive and more precise means." Fox, 492 U.S. at 479, 109 S.Ct. at 3034 (internal quotation marks and citations omitted).  Therefore, § 651(h)(5)(A) violates the First Amendment and must be invalidated.

III.

Accordingly, the court finds and declares that § 651(h)(5)(A) is unconstitutional as applied to the advertisement of AAID and ABOI/ID credentials by dentists who have not completed a formal, full-time advanced education program that is affiliated with or sponsored by a university-based dental school and is beyond the dental degree at a graduate or postgraduate level. See Cal. Bus. & Prof. Code § 651(h)(5)(A)(ii)(I).  The court will schedule a status conference in this case to allow the parties an opportunity to address the scope and timing of the injunctive relief plaintiffs

1  have requested so that defendants may have an opportunity to

2  develop an appropriate disclaimer.  Plaintiffs' motion for

3  summary judgment is GRANTED, and defendants' motion for summary

4  judgment is DENIED.

5

6       IT IS SO ORDERED.

7

8  Dated: 8 September 2004.

9

10

DAVID F. LEVI
United States District Judge

United States District Court
for the
Eastern District of California
September 9, 2004

* * CERTIFICATE OF SERVICE * *

2:03-cv-00348

Potts

   v.

Hamilton

_____

I, the undersigned, hereby certify that I am an employee in the Office of the Clerk, U.S. District Court, Eastern District of California.

That on  September 9, 2004, I SERVED a true and correct copy(ies) of the attached, by placing said copy(ies) in a postage paid envelope addressed to the person(s) hereinafter listed, by depositing said envelope in the U.S. Mail, by placing said copy(ies) into an inter-office delivery receptacle located in the Clerk's office, or, pursuant to prior authorization by counsel, via facsimile.

     Frank R Recker                      HV/DFL
     PRO HAC VICE
     Frank R Recker and Associates LPA
     267 North Collier Boulevard, Suite 202
     Marco Island, FL 34145-3014

     Cynthia June Hubbard
     PRO HAC VICE
     Frank R Recker and Associates LPA
     267 North Collier Boulevard, Suite 202
     Marco Island, FL 34145-3014

     Ann Taylor Schwing
     McDonough Holland and Allen PC
     555 Capitol Mall, 9th Floor
     Sacramento, CA 95814

     Marcia A Fay
     Attorney General's Office
     PO Box 944255
     1300 I Street, Suite 125
     Sacramento, CA 94244-2550

Jack L. Wagner, Clerk

by: Deputy Clerk